## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ACRISURE, LLC,

               Plaintiff,

v.

ROBERT SFORZO, ASHLEY KOPP,
BARBARA KOPP, RITA BALLNER, and
DANIELLE HECKMAN,

               Defendants.

Case No.

Honorable

---

WARNER NORCROSS + JUDD LLP
Edward J. Bardelli (P53849)
Jarrod H. Trombley (P83517)
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503
(616) 752-2000
ebardelli@wnj.com
jtrombley@wnj.com

-and-

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
James R. Carroll (554426-MA)
Christopher G. Clark (663455-MA)
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
christopher.clark@skadden.com

Attorneys for Plaintiff Acrisure, LLC

---

## VERIFIED COMPLAINT

Plaintiff Acrisure, LLC ("Acrisure"), by and through its attorneys Warner Norcross +

Judd LLP and Skadden, Arps, Slate, Meagher & Flom LLP, states its Complaint against Robert

Sforzo, Ashley Kopp, Barbara Kopp, Rita Ballner, and Danielle Heckman (collectively, "Defendants"), upon personal knowledge with respect to itself and its own acts, and upon information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.       On Friday, March 15, 2024, six highly compensated Acrisure insurance and account executives (the "March 15 Executives") executed a coordinated resignation whereby they joined a direct competitor, Woodruff Sayer & Co. ("Woodruff Sawyer"), in substantially similar positions.  Before and after their orchestrated exit, the March 15 Executives violated numerous contractual obligations to Acrisure including with regard to misuse of Acrisure's confidential information and the wrongful solicitation of Acrisure employees and customers.  On March 22, 2024, Acrisure commenced a lawsuit against those March 15 Executives that is pending in this court.  *See Acrisure v. Kelly*, No. 1:24-cv-00318-JMB-PJG (W.D. Mich.) (Beckering, J.).

2.       Upon information and belief, acting in concert with the March 15 Executives, the five Defendants named herein resigned from their positions at Acrisure on or about March 26 and 27.  Defendants are likewise former Acrisure insurance executives and professionals who violated their contractual obligations to Acrisure before and after their coordinated resignations from Acrisure.  In addition to wrongfully soliciting and encouraging other Acrisure employees to leave Acrisure, Acrisure has learned of at least 50 Acrisure customers who have left Acrisure and switched or provided notice that they intend to switch to another insurance broker—many of which already have appointed Woodruff Sawyer as their new broker.  The only plausible explanation for this wave of customer departures is direct or indirect solicitation by one or more of the Defendants, likely working in concert with the March 15 Executives.

3.      In furtherance of this unlawful conduct, upon information and belief, Defendants previewed, accessed, used, and/or downloaded Acrisure's proprietary and confidential information to directly or indirectly solicit customers to terminate their business with Acrisure for the benefit of Woodruff Sawyer.  While Acrisure's investigation remains ongoing, some of this access appears to have been conducted using electronic devices that were not issued by Acrisure.  In light of the Defendants' plan to leave their employment at Acrisure, there was no legitimate Acrisure business reason for that conduct.

4.      Through this action, Acrisure seeks to protect its rights, safeguard its proprietary and confidential information, and enforce its reasonable restrictive covenants to prevent the loss of Acrisure's confidential information, unlawfully soliciting Acrisure employees, and poaching Acrisure's customers.

5.      Acrisure has been and will continue to be irreparably harmed by Defendants' unlawful conduct.

## PARTIES

6.      Acrisure is a Michigan limited liability company with its principal place of business in Grand Rapids, Michigan.  Acrisure's sole member is a Delaware corporation with its principal place of business in Michigan.

7.      Defendant Robert Sforzo is an individual who upon information and belief is a citizen of New York.  Sforzo was a Vice President at Acrisure and had been employed at Acrisure since on or around August 1, 2015, until his resignation on March 27, 2024.

8.      Defendant Ashley Kopp is an individual who upon information and belief is a citizen of New York.  Ashley Kopp was a Commercial Account Manager at Acrisure and had been employed at Acrisure since on or around September 1, 2017, until her resignation on March 26, 2024.

9.      Defendant Barbara Kopp is an individual who upon information and belief is a citizen of New York.  Barbara Kopp was a Commercial Senior Account Manager II at Acrisure and had been employed at Acrisure since on or around September 1, 2017, until her resignation on March 26, 2024.

10.     Defendant Rita Ballner is an individual who upon information and belief is a citizen of New York.  Ballner was a Vice President of Claims, Policy Services & Administration and had been employed at Acrisure since on or around September 1 2017, until her resignation on March 26, 2024.

11.     Defendant Danielle Heckman is an individual who upon information and belief is a citizen of New York.  Heckman was a Senior Bond Administrator at Acrisure since on or around December 17, 2018, until her resignation on March 27, 2024.

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000.  Defendants are citizens of New York.  Plaintiff Acrisure, LLC is a citizen of Michigan and Delaware.  Acrisure, LLC is a Michigan limited liability company and Acrisure, LLC's sole member is Acrisure Intermediate, Inc., a Delaware corporation with its principal place of business in Michigan.

13.     This Court has personal jurisdiction over Defendants because, pursuant to Paragraph 14 of Defendants' agreements of employment with Acrisure (the "Employment Agreements," attached hereto as Exhibits 1-5), Defendants consented to personal jurisdiction in this Court.  Personal jurisdiction is also proper under MCL 600.705.  The Employment Agreements are governed by and construed and enforced in accordance with the laws of the State of Michigan.

14.     Venue in this district is appropriate pursuant to 28 U.S.C. § 1391(b)(3).  Venue is also proper because the Defendants agreed pursuant to Paragraph 14 of the Employment Agreements that any action for enforcement of the Employment Agreements would be brought exclusively in courts located in the County of Kent, State of Michigan and because Kent County is a county in which Acrisure has a place of business under MCL 600.1621(b).

## FACTUAL BACKGROUND

### Acrisure Is A Global Fintech Leader
### Providing Financial Services In The Insurance Brokerage Industry

15.     Acrisure is a global fintech leader based in Grand Rapids, Michigan that provides intelligence-driven financial services solutions across many industries, including the insurance brokerage industry.  Acrisure has offices throughout the United States, including in New York.

16.     The insurance brokerage industry is highly competitive to soliciting and maintaining customers, accounts, and employees.

17.     Acrisure spends significant time and money developing an experienced and leading team of insurance brokerage professionals who help Acrisure's customers to address their unique needs and further their business relationship with Acrisure.

18.     Acrisure makes significant investments to acquire, build and retain its customer base and customer relationships, its goodwill, business reputation and brand, and its employee workforce.

19.     Acrisure invests in innovative technology, training of its workforce, strong referral networks, and business contacts that are critical to developing and retaining its insurance customer relationships.

20.     Acrisure invests substantial time and resources protecting its confidential, proprietary, and trade secret information and prevents such information from being shared

publicly, either intentionally or by accident, through a variety of processes and procedures. Acrisure takes reasonable and appropriate steps to protect its confidential information and restricts access to that non-public information.  Among other things, Acrisure protects its confidential information by password protecting its computers, network, and other databases; restricting access to certain databases or information so that only those personnel who require the information can access it; restricting access to Acrisure facilities and alarming those premises; requiring employees to sign employment agreements which contain confidentiality clauses; requiring that employees return all confidential information upon termination of their employment; and requiring confidentiality from employees with respect to Acrisure's confidential information and trade secrets.

21.     Acrisure also protects its proprietary and confidential information and business relationships by obtaining from employees who have particularly important roles non-solicitation agreements that reasonably restrict employment with direct competitors, the solicitation of certain client and prospective client accounts, and the solicitation of Acrisure employees for employment under certain circumstances for up to two-years after termination from Acrisure.

### The Defendants Agreed To<br>Employment Agreements With Acrisure

22.     The Employment Agreements signed by Defendants contain substantially the same terms.

### Defendant Sforzo

23.     As a condition of his employment with Acrisure, Sforzo entered into and is bound by the Employment Agreement (Producer) dated August 1, 2018 (the "Sforzo Employment Agreement," attached hereto as Exhibit 1).  At Acrisure, Sforzo was responsible for, among other things, managing, soliciting, and selling customers various insurance products and services and

6

providing related services to customers in the New York region.  Sforzo was highly compensated by Acrisure, receiving annual compensation of hundreds of thousands of dollars.

24.     In his role, Sforzo had access to, and made use of, Acrisure's proprietary and confidential information, including, but not limited to, employee information, costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies, and employee relationships.  Sforzo was hired as an Account Executive in the Construction & Real Estate Practice group at Woodruff Sawyer.

**Defendant Ashley Kopp**

25.     As a condition of her employment with Acrisure, Ashley Kopp entered into and is bound by the Employment Agreement (Non-Producer) dated September 1, 2017 (the "Ashley Kopp Employment Agreement," attached hereto as Exhibit 2).  At Acrisure, Ashley Kopp worked directly with clients and was responsible for, among other things, providing customer service to assigned accounts to retain business and positively impact revenue generation by her client interaction in the New York region.

26.     In her role, Ashley Kopp had access to, and made use of, Acrisure's proprietary and confidential information, including, but not limited to, employee information, costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies, and employee relationships.  Upon information and belief, Ashley Kopp was hired to work in a similar position with similar responsibilities at Woodruff Sawyer.

**Defendant Barbara Kopp**

27.     As a condition of her employment with Acrisure, Barbara Kopp entered into and is bound by the Employment Agreement (Non-Producer) dated September 1, 2017 (the "Barbara Kopp Employment Agreement," attached hereto as Exhibit 3).  At Acrisure, Barbara Kopp

7

worked directly with clients and was responsible for, among other things, providing customer service to assigned accounts to retain business and positively impact revenue generation by her client interaction in the New York region.  Barbara Kopp was highly compensated by Acrisure, receiving annual compensation of over one hundred thousand dollars.

28.     In her role, Barbara Kopp had access to, and made use of, Acrisure's proprietary and confidential information, including, but not limited to, employee information, costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies, and employee relationships.  Upon information and belief, Barbara Kopp was hired to work in a similar position with similar responsibilities at Woodruff Sawyer.

**Defendant Rita Ballner**

29.     As a condition of her employment with Acrisure, Ballner entered into and is bound by the Employment Agreement (Non-Producer) dated September 1, 2017 (the "Ballner Employment Agreement," attached hereto as Exhibit 4).  At Acrisure, Ballner was a Vice President in an executive role and responsible for, among other things, directly interacting with clients, managing claims, and providing related services to customers in the New York region. Ballner was highly compensated by Acrisure, receiving annual compensation of hundreds of thousands of dollars.

30.     In her role, Ballner had access to, and made use of, Acrisure's proprietary and confidential information, including, but not limited to, employee information, costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies, and employee relationships.  Upon information and belief, Ballner was hired to work in a similar position with similar responsibilities at Woodruff Sawyer.

**Defendant Danielle Heckman**

31.     As a condition of her employment with Acrisure, Heckman entered into and is bound by the Employment Agreement (Non-Producer) dated December 17, 2018 (the "Heckman Employment Agreement," attached hereto as Exhibit 5).  At Acrisure, Heckman was responsible for, among other things, creating and executing new and renewal surety bonds for bonded customers and providing related services to customers in the New York region.

32.     In her role, Heckman had access to, and made use of, Acrisure's proprietary and confidential information, including, but not limited to, employee information, costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies, and employee relationships.  Upon information and belief, Heckman was hired to work in a similar position with similar responsibilities at Woodruff Sawyer.

### The Defendants Agreed To Certain Reasonable Restrictions That Protect Acrisure

33.     Acrisure hired and compensated the Defendants in exchange for, among other things, their agreement to certain reasonable protections of Acrisure's information and property and restrictive covenants.

34.     The confidential and competitive business and customer information to which Defendants had access throughout their employment with Acrisure is critical to Acrisure's competitive position in the insurance brokerage industry and would be of substantial value to a competitor such as Woodruff Sawyer, which sells similar or identical products and services that Acrisure offers.

35.     Defendants agreed in Paragraph 8 of their Employment Agreements to protect Acrisure's confidential information from unauthorized disclosure:

> Employee will have access to confidential information about the Company (the "Confidential Information"), including, without limitation, information about the Company's operations, processes, procedures, trade secrets, agent

lists, adjuster lists, rating techniques, rates, coverage, accounting rules, employee information, insurance companies, computer techniques, marketing techniques, advertising techniques, know-how, finances, business plans, costs, pricing, sales, customer lists, the needs and demands of customers, and vendor lists, including lists and contacts with insurance companies.  In addition, Employee will develop other information that the Company considers to be Confidential Information.  Employee will not, directly or indirectly, disclose, furnish, or make available, except in the course of performing Employee's duties of employment under this Agreement, any Confidential Information (regardless of how Employee learned of it or who developed it), without the Company's prior written approval.  These restrictions concerning Confidential Information shall remain in effect following termination of this Agreement or termination of Employee's employment with the Company, without limitation.

36.    Defendants agreed in Paragraph 9 of their Employment Agreements to return to

Acrisure immediately upon termination of employment all Acrisure property:

Employee shall, immediately upon termination of employment for any reason, return to the Company all client records of any sort and all Company literature, supplies, letters, written or printed forms, diaries, phone lists, documents containing customer lists, customer information, product information, pricing information, information as to sources of services, financial information of the Company and memoranda pertaining to the Company's business.  Employee shall also, immediately upon termination of employment, return to the Company all Company property in Employee's possession, including automobiles, telephones, and any other Company-issued equipment.

37.    Defendants agreed in Paragraph 10 of their Employment Agreements to certain

restrictive covenants regarding the solicitation of employees and customers:

The Company and Employee agree that the Company will provide Employee with the opportunity to receive compensation pursuant to this Agreement and the same constitutes valuable consideration.  Employee further acknowledges that Employee will be provided with access to customer and other confidential information concerning the Company's business, as well of that of the Company's affiliated entities without limitation ("Affiliated Entities" or individually "Affiliated Entity.")  It is further agreed that it requires special and unique knowledge and information to act as a business agent on behalf of the Company and that the Employee shall gain such special and unique knowledge and information from the Company and/or Affiliated Entities throughout the time of his/her employment by the Company.  This knowledge and information are integral parts of the business of the Company and/or of the

Affiliated Entities and the use of this knowledge and information by a competitor of the Company would cause irreparable harm to the Company. The Company and Employee agree that this knowledge and information constitute legitimate protectable business interests of the Company and/or of the Affiliated Entities.  The Company and Employee further agree that the business Employee secures, develops or services for the Company or for an Affiliated Entity shall constitute the exclusive property of the Company. In view of the foregoing, Employee agrees that, for the duration of Employee's employment, and in the event Employee's employment is terminated for any reason, for a period of two (2) years after the termination of employment: [subsections (a)(i)–(iii) omitted and discussed below]

38.     Pursuant to Paragraph 10 of the Employment Agreements, Defendants agreed that during their employment and for two years after the termination of their employment, they will not directly or indirectly contact any Acrisure customers that they engaged with or had knowledge of during their employment:

    a.  <u>Non-Solicitation/Non-Interference</u>.  Employee will not directly or indirectly, for himself/herself or for any other person, corporation, firm or entity, either as a principal, shareholder, member, agent, manager, employee, contractor, owner, partner, director, officer or in any other capacity, engage in any of the following activities, without regard to geographic location:

        i.  Contacting or engaging in any communication with any Company or Affiliated Entity customer for whom Employee had responsibility, or contacting or engaging in any communications with any Company or Affiliated Entity customer or prospective Company or Affiliated Entity customer about whom Employee obtained knowledge during employment with the Company, to secure business competitive to the products and services provided by the Company or Affiliated Entity;

39.     Pursuant to Paragraph 10 of their Employment Agreements, Defendants agreed that during their employment and for two years after the termination of their employment, they will not directly or indirectly solicit any Acrisure customer to "terminate or curtail its relationship" with Acrisure:

    a.  <u>Non-Solicitation/Non-Interference</u>.   Employee will not directly or indirectly, for himself/herself or for any other person, corporation, firm or entity, either as a principal, shareholder, member, agent, manager, employee, contractor, owner, partner, director, officer or in any other

capacity, engage in any of the following activities, without regard to geographic location:

[. . .]

ii.     Requesting, advising, or encouraging any customer of the Company or of an Affiliated Entity to terminate or curtail its relationship with the Company or Affiliated Entity, or requesting or advising any person to refrain from becoming a customer or supplier of the Company or Affiliated Entity;

40.     Pursuant to Paragraph 10 of the Employment Agreements, Defendants agreed that during their employment and for two years after the termination of their employment, they will not directly or indirectly solicit any Acrisure employee to "terminate" its relationship with Acrisure or pursue any Acrisure employee for employment without permission from Acrisure:

a.     <u>Non-Solicitation/Non-Interference</u>.   Employee will not directly or indirectly, for himself/herself or for any other person, corporation, firm or entity, either as a principal, shareholder, member, agent, manager, employee, contractor, owner, partner, director, officer or in any other capacity, engage in any of the following activities, without regard to geographic location:

[. . .]

iii.    Requesting, advising, or encouraging any employee, agent, representative or independent contractor of the Company or an Affiliated Entity to terminate his, her, or its relationship with the Company or Affiliated Entity, or requesting or advising any person to refrain from becoming an employee, agent, representative or independent contractor of the Company or of an Affiliated Entity, or otherwise pursuing, employing or retaining (as an employee, an independent contractor or otherwise) any employee, agent, representative or independent contractor of the Company or of an Affiliated Entity without the written permission of the Company.

41.     Pursuant to Paragraph 11 of their Employment Agreements, Defendants further agreed that the restrictions contained in Paragraph 10 are reasonable and necessary to protect Acrisure's business and interests including Acrisure's goodwill and confidential information. Pursuant to Paragraph 11 of their Employment Agreements, Defendants further agreed that

"there is no adequate remedy at law if Employee violates Paragraph 10," that any violation of Paragraph 10 would cause Acrisure to suffer substantial and irreparable injury, and that Acrisure "is entitled, in addition to any other remedies, to preliminary and permanent injunctive relief."

42.     Defendants agreed in Paragraph 14 of their Employment Agreements that Acrisure may "recover damages for a breach of this Agreement by civil suit, injunction or otherwise, and Employee shall be liable to [Acrisure] for the reasonable costs and attorneys' fees of any such action in which a breach is established."

43.     The restrictive covenants contained in Paragraph 10 of the Employment Agreements are reasonable in scope to protect Acrisure's legitimate business interests (including its proprietary and confidential information and relationships with customers), are not harmful to the general public, and are not unreasonably burdensome to Defendants.  Indeed, pursuant to the Employment Agreements, Defendants agreed that the restrictive covenants are reasonable.

44.     Defendants' use and or disclosure of Acrisure's confidential information, retention of Acrisure property, and violation of the restrictive covenants would put Acrisure at a competitive disadvantage and could easily be used by Woodruff Sawyer or any other competitor to Acrisure's competitive disadvantage.

**On March 15, 2024, Six Acrisure
Executives Executed A Coordinated Resignation From
Acrisure Immediately After Accessing, Deleting, And Downloading Acrisure Files**

45.     On the evening of Friday, March 15, 2024, six executives resigned from their positions at Acrisure, effective immediately and without prior notice (the "March 15 Executives").  All of the March 15 Executives worked at the same Acrisure office in Woodbury, New York in the construction practice.  Prior to their coordinated resignations, Defendants worked in the same Woodbury office in the construction practice with the March 15 Executives.

46.     All of the March 15 Executives sent nearly identical emails to Acrisure tendering their resignation effective immediately.  The six resignation emails are substantively similar to each other and use many of the same phrases.

47.     Upon information and belief, the March 15 Executives each had already accepted offers to work at Woodruff Sawyer in substantially the same roles they had at Acrisure at the time they tendererd their resignations.

48.     Upon information and belief, the March 15 Executives—and Defendants— directly or indirectly recruited, solicited, or encouraged each other to leave Acrisure while employed at Acrisure to join Woodruff Sawyer in violation of their contractual obligations to Acrisure.

49.     Acrisure's initial investigation has already revealed that almost all of the March 15 Executives accessed and deleted hundreds of files containing Acrisure information, and two of the March 15 Executives downloaded Acrisure information—and did so from non-Acrisure managed devices—just hours before resigning.

50.     Acrisure's forensic investigation remains ongoing.

**The Day After The March 15 Executives' Resignations,**
**A Direct Competitor Begins Advertising Their Arrival**

51.     Less than 24 hours after the March 15 Executives' coordinated resignations, on Saturday morning, March 16, 2024, Woodruff Sawyer began advertising the hiring of the March 15 Executives as part of Woodruff Sawyer's "Newest Market Expansion."

52.     Then, on Monday, March 18, 2024, just one business day following the March 15 Executives' coordinated resignations from Acrisure, Woodruff Sawyer publicly announced in a press release that it had hired the March 15 Executives to expand its business and arrive in New York.  The Woodruff Sawyer press release states that Woodruff Sawyer is "expanding their East

Coast footprint with the addition of six members formerly with Acrisure's Construction and Commercial Risk Practice" and "bringing together over 100 years of combined experience, the new team—Matthew Kelly, Robert Trager, Bob Kempner, Chris Iovino, Eric Wagner, and Michael Rella—brings diverse backgrounds in construction, bonding, and surety to further strengthen Woodruff Sawyer's established industry presence."

### As Soon As The March 15 Executives Arrived At Woodruff Sawyer, Some Or All Of Them Began Unlawfully Soliciting Acrisure Customers

53.     Upon information and belief, certain of the March 15 Executives wasted no time reaching out to Acrisure's customers in an attempt to obtain business for Woodruff Sawyer.

54.     From the day of their coordinated resignation to today, at least 50 Acrisure customers switched or notified Acrisure that they intended to switch their insurance program from Acrisure to another insurance broker.  The timing of this wave of customer departures strongly suggests that some or all of the March 15 Executives—and Defendants, as described below—have directly or indirectly solicited, encouraged, or induced these former Acrisure customers.

55.     Upon information and belief, some or all of the March 15 Executives unlawfully solicited these customers by using or disclosing Acrisure's confidential information.  Many of these customers expressly stated that they switched their insurance program from Acrisure to Woodruff Sawyer as their exclusive broker for the insurance programs Acrisure previously managed.  Upon information and belief, these customers' switch from Acrisure to Woodruff Sawyer was the result of the direct or indirect unlawful solicitation, encouragement, or inducement by some or all of the March 15 Executives.

56.     Upon information and belief, the March 15 Executives—now with the direct or indirect assistance or involvement of at least some of the Defendants—are continuing to solicit other Acrisure customers to no longer be a customer of Acrisure.

57.     On March 22, 2024, Acrisure commenced a civil action against the March 15 Executives in the 17th Judicial Circuit Court for the County of Kent, State of Michigan.

58.     On March 25, 2024, that court entered a temporary restraining order that, among other things, restrains and enjoins the March 15 Executives from using any of Acrisure's confidential information as well as soliciting any Acrisure customer for whom they had responsibility before leaving Acrisure.

59.     On March 27, 2024, the March 15 Executives removed the action to the United States District Court for the Western District of Michigan (Southern Division).

**The Defendants Temporarily Stay Behind At
Acrisure After The March 15 Executives' Resignations
And At Least One Defendant Gathers Acrisure Information**

60.     Upon information and belief, Defendants had also accepted employment at Woodruff Sawyer while they were still employed by Acrisure.

61.     After the March 15 Executives resigned, Defendants remained at Acrisure for nearly two additional weeks and, upon information and belief, at least one of the Defendants gathered information for the benefit of themselves, the March 15 Executives, and/or Woodruff Sawyer.

**The Defendants Resign From Acrisure
Immediately After Accessing, Deleting, And Downloading Acrisure Files**

62.     On March 26, 2024, Ashley Kopp, Barbara Kopp, and Ballner each resigned from Acrisure, effective immediately and without prior notice.  On information and belief, Ashley Kopp, Barbara Kopp, and Ballner's resignations were coordinated.  Upon information and belief,

16

with the encouragement and assistance of one or more of the March 15 Executives and other Defendants, Ashley Kopp, Barbara Kopp, and Ballner each had already accepted offers to work at Woodruff Sawyer in substantially the same roles they had at Acrisure at the time they tendered their resignations.

63.     The next day, on the afternoon of March 27, 2024, Sforzo tendered his resignation from Acrisure, effective immediately and without prior notice. Sforzo's resignation email is substantively similar to those of the March 15 Executives, using similar phrases. Upon information and belief, Sforzo had already accepted an offer to work at Woodruff Sawyer in substantially the same role he had at Acrisure at the time he tendered his resignation. According to Sforzo's LinkedIn, his title at Woodruff Sawyer is Account Executive, Construction & Real Estate Practice.

64.     Later that day, on the evening of March 27, 2024, Heckman tendered her resignation from Acrisure, effective immediately and without prior notice. Upon information and belief, with the encouragement and assistance of one or more of the March 15 Executives and other Defendants, Heckman had already accepted an offer to work at Woodruff Sawyer in substantially the same role she had at Acrisure at the time she tendered her resignation.

65.     Upon information and belief, Defendants acted with one or more of the March 15 Executives and other Defendants to directly or indirectly recruit, solicit, and encourage each other and other Acrisure employees to leave Acrisure for Woodruff Sawyer.

66.     Acrisure's internal investigation has already revealed that immediately prior to their resignations, Defendants previewed, accessed, deleted, and downloaded hundreds or thousands of Acrisure files.

67.     Between Tuesday, March 12 and Wednesday, March 27, Robert Sforzo downloaded more than 300 files, accessed more than 960 files, previewed more than 360 files, and deleted more than 140 files.  At the time he did so, upon information and belief, Robert Sforzo had already accepted employment at Woodruff Sawyer.  As such, Robert Sforzo's loyalties had shifted away from Acrisure and to Woodruff Saywer.  Robert Sforzo had no basis to delete Acrisure's files, preview Acrisure's files, access Acrisure's files, or download Acrisure's files at that time.

68.     Between Sunday, March 24 and Tuesday, March 26, Ashley Kopp downloaded more than 15 files, accessed more than 110 files, previewed more than 40 files, and deleted more than 2,800 files.  At the time she did so, upon information and belief, Ashley Kopp had already accepted employment at Woodruff Sawyer.  As such, Ashley Kopp's loyalties had shifted away from Acrisure and to Woodruff Saywer.  Ashley Kopp had no basis to delete Acrisure's files, preview Acrisure's files, access Acrisure's files, or download Acrisure's files at that time. Notably, 15 of the 16 downloaded files were downloaded on non-Acrisure managed devices.

69.     Between Sunday, March 24 and Tuesday, March 26, Barbara Kopp accessed more than 80 files, previewed more than 15 files, and deleted more than 140 files.  At the time she did so, upon information and belief, Barbara Kopp had already accepted employment at Woodruff Sawyer.  As such, Barbara Kopp's loyalties had shifted away from Acrisure and to Woodruff Saywer.  Barbara Kopp had no basis to delete Acrisure's files, preview Acisure's files, access Acrisure's files, or download Acrisure's files at that time.

70.     In the hours prior to her resignation, Ballner also downloaded files, accessed files, and previewed afiles on a non-Acrisure managed device.  At the time she did so, upon information and belief, Ballner had already accepted employment at Woodruff Sawyer.  As such,

Ballner's loyalties had shifted away from Acrisure and to Woodruff Sawyer.  Ballner had no

basis to preview Acrisure's files, access Acrisure's files, or download Acrisure's files at that time.

71.     In the days and hours prior to her resignation, Heckman also downloaded files,

accessed more than files, previewed seven files, and emailed several files to her personal email

address.  At the time she did so, upon information and belief, Heckman had already accepted

employment at Woodruff Sawyer.  As such, Heckman's loyalties had shifted away from Acrisure

and to Woodruff Sawyer.  Heckman had no basis to preview Arisure's files, access Acrisure's

files, download Acrisure's files, or email Acrisure files to her personal email at that time.

72.     In light of Defendants' impending plan to leave their employment at Acrisure,

there was no legitimate Acrisure business reason for those documents to be accessed, deleted,

previewed, or downloaded right before Defendants' resignations.

73.     Defendants did not—and do not—have permission to retain copies of Acrisure's

information or transfer it outside of Acrisure.

74.     Defendants would not have been given permission to do so had they asked.

75.     Acrisure's forensic investigation remains ongoing.

**Several Of The Defendants Have Been Engaged
In A Coordinated Effort To Solicit Acrisure Customers**

76.     Between March 15, 2024, and the present, at least 50 Acrisure customers

switched or notified Acrisure that they intended to switch to another insurance broker—most of

them to Woodruff Sawyer.  Given the timing, the only plausible explanation for these customer

departures—particularly those to Woodruff Sawyer—is unlawful solicitation by at least some of

the Defendants and the March 15 Executives.

77.     Defendants were Account Executives or other contacts for many of these

customers while employed by Acrisure.  At least six Acrisure customers for which Sforzo was

the Account Executive have left Acrisure for Woodruff Sawyer.  Barbara Kopp was the Account

Manager for at least nine Acrisure customers who have left, and Ashley Kopp was the Account

Manager for at least two Acrisure customer who left for Woodruff Sawyer.  Danielle Heckman

was the bond administrator for Acrisure customers who have left.

78.     For example, on March 18, 2024, the same day as Woodruff Sawyer's press

release, Acrisure learned that two of its long-standing and significant customers ("Customer F"

and "Customer G") indicated that they had appointed Woodruff Sawyer as their exclusive broker

for their surety insurance program that Acrisure had previously managed.

79.     While at Acrisure, Defendant Sforzo was Customer F's and Customer G's

Account Executive and one of the March 15 Executives was their insurance producer.

80.     Upon information and belief, Defendant Sforzo assisted in the unlawful

solicitation of Customer F and Customer G by using or disclosing Acrisure's confidential

information.

81.     Upon information and belief, at least some of the Defendants are continuing to

directly or indirectly solicit other Acrisure customers to no longer be a customer of Acrisure.

82.     The products and services of Woodruff Sawyer are competitive to the products

and services of Acrisure.

83.     Upon information and belief, unless enjoined and restrained, Defendants will

continue to violate their contractual obligations to Acrisure.

**Defendants Agreed That If They Breached Certain Restrictions In Their
Employment Agreements, Acrisure Would Be Entitled To Obtain Injunctive Relief**

84.     As noted above, in the Employment Agreements, Defendants agreed that any

violation of the restrictions contained in Paragraph 10 of the Employment Agreements would

cause Acrisure to suffer substantial and irreparable injury, and that Acrisure "is entitled, in addition to any other remedies, to preliminary and permanent injunctive relief."

85.     Defendants' wrongful conduct is causing immediate, irreparable harm to Acrisure.  Acrisure is therefore in need of immediate, temporary, and permanent relief from this Court.

## COUNT I
### (Breach of Contract Against All Defendants:
### Acrisure Confidential Information And Property)

86.     Acrisure incorporates its allegations contained in the preceding paragraphs as if fully stated herein.

87.     The Employment Agreements constitute valid and binding contracts between Acrisure and Defendants, which include reasonable restrictive covenants that are limited in scope.  The Employment Agreements were made for valid consideration.

88.     Acrisure fully performed its obligations under the Employment Agreements.

89.     In exchange for agreeing to these restrictions, Defendants were employed by Acrisure and received significant annual compensation from Acrisure in connection with their employment.

90.     The Employment Agreements are reasonable, consonant with public policy, and necessary to protect Acrisure's proprietary and confidential information, relationships with its customers, and other reasonable competitive business interests and Acrisure property.

91.     While at Acrisure, Defendants had access to, and made use of, Acrisure's proprietary and confidential information, including, but not limited to, employee information, costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies, and employee relationships.

92.     Upon information and belief, Defendants breached Paragraph 8 of the Employment Agreements by using or disclosing Acrisure's Confidential Information, including, but not limited to, customer lists and customer demands.

93.     Upon information and belief, Defendants breached Paragraph 9 of their Employment Agreements by failing to return to Acrisure immediately upon termination of employment all Acrisure property.

94.     These breaches have and will directly and proximately cause Acrisure irreparable damage and injury, including to its competitive place in the insurance and risk management market and to its relationships with its customers.

### COUNT II
**(Breach of Contract Against All Defendants: The Non-Solicitation Of Acrisure Employees)**

95.     Acrisure incorporates its allegations contained in the preceding paragraphs as if fully stated herein.

96.     The Employment Agreements constitute valid and binding contracts between Acrisure and Defendants, which include reasonable restrictive covenants that are limited in scope.  The Employment Agreements were made for valid consideration.

97.     Acrisure fully performed its obligations under the Employment Agreements.

98.     In exchange for agreeing to these restrictions, Defendants were employed by Acrisure and received significant annual compensation from Acrisure in connection with their employment.

99.     The Employment Agreements are reasonable, consonant with public policy, and necessary to protect Acrisure's proprietary and confidential information, relationships with its customers, and other reasonable competitive business interests and Acrisure property.

100.     While at Acrisure, Defendants had access to, and made use of, Acrisure's proprietary and confidential information, including, but not limited to, employee information, costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies, and employee relationships.

101.     Upon information and belief, Defendants breached Paragraph 10 of the Employment Agreements by directly or indirectly requesting, advising, or encouraging Acrisure employees to terminate their employment with Acrisure and join Woodruff Sawyer.

102.     These breaches have and will directly and proximately cause Acrisure irreparable damage and injury, including to its competitive place in the insurance and risk management market and to its relationships with its customers.

## COUNT III
### (Breach of Contract Against All Defendants: The Non-Solicitation Of Acrisure Customers)

103.     Acrisure incorporates its allegations contained in the preceding paragraphs as if fully stated herein.

104.     The Employment Agreements constitute valid and binding contracts between Acrisure and Defendants, which include reasonable restrictive covenants that are limited in scope.  The Employment Agreements were made for valid consideration.

105.     Acrisure fully performed its obligations under the Employment Agreements.

106.     In exchange for agreeing to these restrictions, Defendants were employed by Acrisure and received significant annual compensation from Acrisure in connection with their employment.

107.     The Employment Agreements are reasonable, consonant with public policy, and necessary to protect Acrisure's proprietary and confidential information, relationships with its customers, and other reasonable competitive business interests and Acrisure property.

23

108.    While at Acrisure, Defendants had access to, and made use of, Acrisure's proprietary and confidential information, including, but not limited to, employee information, costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies, and employee relationships.

109.    Upon information and belief, since the March 15 Executives' departure—which Defendants were aware of in advance—at least 50 Acrisure customers switched or notified Acrisure that they intended to switch from Acrisure.

110.    Upon information and belief, the products and services of Woodruff Sawyer are competitive to the products and services of Acrisure.

111.    Upon information and belief, Defendants are continuing to directly or indirectly solicit other Acrisure customers to no longer be a customer of Acrisure.

112.    Upon information and belief, Defendants breached Paragraph 10 of the Employment Agreements by directly or indirectly contacting, soliciting, or engaging Acrisure customers to terminate their relationship with Acrisure and instead become a customer of Woodroof Sawyer.

113.    These breaches have and will cause Acrisure irreparable damage and injury, including to its competitive place in the insurance and risk management market and to its relationships with its customers.

**COUNT IV**
**(Common Law Conversion Against All Defendants)**

114.    Acrisure incorporates its allegations contained in the preceding paragraphs as if fully stated herein.

115.    Upon information and belief, leading up to and on the day of Defendants' resignations, Defendants wrongfully exercised dominion and control over Acrisure's property

inconsistent with their rights based on the pattern of practice of intentionally accessing, downloading, and deleting Acrisure files and information leading up to and on the day of their coordination resignations.

116.   Defendants' previewing, accessing, downloading, and deleting of Acrisure files at that time constitutes conversion of Acrisure's property.

117.   Defendants' conversion of Acrisure property will cause Acrisure irreparable damage and injury, including to its competitive place in the insurance and risk management market and to its relationship with its customers.

<u>**REQUESTED RELIEF**</u>

WHEREFORE, Acrisure requests that this honorable Court:

A.     Enter a temporary restraining order, without notice, as requested in Acrisure's Proposed Temporary Restraining Order And Order To Show Cause.

B.     Enter a preliminary injunction enjoining Defendants from engaging in conduct in violation of the Employment Agreements until such time as this case can be decided on the merits.

C.     Enter a permanent injunction enjoining Defendants from engaging in conduct in violation of the Employment Agreements.

D.     Enter Judgment against Defendants in favor of Acrisure in an amount to be determined.

E.     Award Acrisure its attorneys' fees and expenses.

F.     Award Acrisure pre- and post-judgment interests and costs.

G.     Grant such other relief as the Court deems just and equitable, including exemplary damages.

## **VERIFICATION**

I, Andrew Schutt, Head of North American Operations at Acrisure, LLC, verify, under the penalties of perjury, that the contents of the foregoing Complaint are true and correct to the best of my knowledge, information, and belief.

Date: April 5, 2024

ACRISURE, LLC

By: _Andrew Schutt_____
DocuSigned by:
D7E0A5F33E2E44A...

Dated: April 5, 2024

WARNER NORCROSS + JUDD LLP

 /s/ Edward J. Bardelli
Edward J. Bardelli (P53849)
Jarrod H. Trombley (P83517)
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503
(616) 752-2000
ebardelli@wnj.com
jtrombley@wnj.com

-and-

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
James R. Carroll (554426-MA)
Christopher G. Clark (663455-MA)
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
christopher.clark@skadden.com

Attorneys for Plaintiff Acrisure, LLC